INTERBOROUGH RAPID TRANSIT COMPANY, Appellant, *v.* NEW YORK RAPID TRANSIT CORPORATION, Respondent.

Argued October 13, 1938; decided January 17, 1939.

*Louis S. Carpenter, James L. Quackenbush* and *Smith L. Multer* for appellant. The lengthy deliberations resulting in the rapid transit contracts, the exactness of their terms, and the certainty of the rights and obligations thereunder should be given great weight. (*City of New York* v. *Interborough R. T. Co.*, 257 N. Y. 20; *City of New York* v. *New York Tel. Co.*, 278 N. Y. 9; *Matter of Rapid Transit R. R. Commrs.*, 197 N. Y. 81; *Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110; *Gilchrist* v. *Interborough Co.*, 279 U. S. 159; *New York R. T. Corp.* v. *City of New York*, 275 N. Y. 258; 58 Sup. Ct. Rep. 721.) The agreement for trackage rights was a business arrangement as to a special and unique situation, wherein the Brooklyn Company became joint operator of a railroad in which it had no investment, and the plaintiff, by agreement with the city, had a just priority of claim to all revenues or rental from railroads constructed under contract No. 3, including the Steinway Tunnel Line, to safeguard the plaintiff's large investment in city-owned subways. (*Schweinburg* v. *Altman*, 145 App. Div. 377; 207 N. Y. 681; *Matter of People ex rel. Delaney* v. *Interborough R. T. Co.*, 192 App. Div. 450; 230 N. Y. 558.) The proviso in question, which, by deferring contingently immediate payment of rental otherwise payable unconditionally upon specified dates, is a concession to the Brooklyn Company, presumed to have been inserted at its request, and is, therefore, subject to a strict construction as against the Brooklyn Company. (2 Parsons on Contracts [9th ed.], p. 664; 13 C. J. p. 546; *Evelyn Bldg. Corp.* v. *City of New York*, 257 N. Y. 501; *Mason Co.* v. *City of New York*, 249 App. Div. 538; 275 N. Y. 514; *Mutual Life Ins. Co.* v. *Hill*, 193 U. S. 551.) The judgment of the court below is based upon contract No. 3. Contract No. 4 and the supplementary agreement are not one contract. The trackage rights agreement of the parties is set forth completely in the supplementary agreement; portions of contract No. 4, specifically men-

tioned therein, serve the exclusive purpose of a statement of specifications. (*Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110; *City of New York* v. *Interborough R. T. Co.*, 257 N. Y. 20; *Hutchison* v. *Ross*, 233 App. Div. 626; 262 N. Y. 381; *Williams* v. *Barkley*, 165 N. Y. 48; *Caruthers* v. *Donahue*, 85 Conn. 629.)

*Harold L. Warner* and *George D. Yeomans* for respondent. The supplementary agreement must be read in conjunction with all of contracts Nos. 3 and 4 and the intention of the parties derived from a reading of all three contracts together must govern the interpretation of the paragraph of the supplementary agreement in question. (*Atwater & Co.* v. *Panama R. R. Co.*, 246 N. Y. 519; *Meriden Britannia Co.* v. *Zingsen*, 48 N. Y. 247; *Baird* v. *Erie R. R. Co.*, 210 N. Y. 225; *Peterson* v. *Miller Rubber Co.*, 24 Fed. Rep. [2d] 59; *Metropolitan Securities Co.* v. *Ladd*, 173 Fed. Rep. 269; *Bailey* v. *Hannibal & St. Joseph R. R. Co.*, 84 U. S. 96.)

CRANE, Ch. J. The "Supplementary Agreement" was executed at the same time as Contracts Nos. 3 and 4. It refers specifically to both contracts "as if the same were herein fully set forth." This supplemental contract related to the Steinway Tunnel Line and fixed the terms on which the New York Municipal Railway Corporation (defendant's predecessor and referred to as the Brooklyn Company) could use it to the extent of one-half its capacity.

Contracts 3 and 4 provide for the construction of certain railroads to be owned by the city of New York. The plaintiff (called the Interborough) and the Brooklyn Company were required to furnish the equipment for and contribute toward the cost of construction of the new railroads to be built and operated. Out of the revenue derived from the operation of its system each railroad was to receive certain preferential payments, which were to be cumulative and all deficits therein were to be paid

in full before the city should receive any return on the money put up by it. This is the dominant idea expressed and running through all these contracts, viz., out of revenues the railroads were to receive first payments of certain amounts before the city received anything. The years were divided into quarters for accounting purposes but any deficits were carried over and had to be made up before the city got its share. These preferential contracts are much alike, this dominant purpose being in all three. Thus by article XLIX of Contract 4 " the gross receipts from whatever source derived directly or indirectly by the lessee [Brooklyn Company] or on its behalf in any manner from, out of or in connection with the operation of the Railroad and the Existing Railroads (hereinafter referred to as the ' revenue ') shall be combined during the term of this contract and the city shall receive for the use of the Railroad at the intervals provided a specified part or proportion of the income, earnings and profits of the Railroad and the Existing Railroads. The amount of such income, earnings and profits shall be determined as follows: From the revenue the Lessee shall at the end of each quarter year ending December 31, March 31, June 30 and September 30, deduct in the order named: " 1. Certain rentals as specified. 2. Taxes and assessments. 3. " All expenses, exclusive of maintenance, actually and necessarily incurred by the Lessee in the operation of the Railroad and the Existing Railroads." 4. " An amount equal to twelve per centum (12%) of the revenue for the maintenance," etc. 5. An amount for depreciation. 6. " One-quarter ($\frac{1}{4}$) of the sum of three million five hundred thousand dollars ($3,500,000) to be retained by the Lessee for each quarter year of the term of the lease," etc. 7. " One-quarter ($\frac{1}{4}$) of an amount equal to six percentum (6%) of (1) the Lessee's contribution toward the cost of construction of the Railroads," etc. 8. An amount to be retained equal to one-fourth of the annual interest payable by the lessee on the cost

of additional equipment as defined in the contract. Then and then only does the city come in for anything. In subdivision 9 for each quarter year the city is to be paid one-quarter ($\frac{1}{4}$) of the annual interest payable by the city upon its share of the cost of construction, together with one-quarter of one per cent of the city's share of the cost of construction. Subdivisions 10 and 11 specify other payments to the city after which comes the prophetic section 12, " The amount remaining after making all such deductions shall be deemed to be the income, earnings and profits of the Railroad and the Existing Railroads," to be divided fifty, fifty.

These items are important here merely to show that the " preferential " consists in the eight items which the railroad is to receive each quarter before the city comes in under item 9. And to make sure that the " quarter years " are not confusing, article LI is inserted, reading: " If in any quarter year the revenue shall be insufficient to meet the various obligations and deductions referred to in Article XLIX, the deficits shall be cumulative and payments of such deficits shall be thereafter made in full before deducting the amounts required in the paragraph of such article, succeeding the paragraph providing for the payment of the obligations or deductions as to which there has been such deficit."

The supplementary agreement must be read in harmony with the underlying specifications of the main contracts, referred to as " if the same were herein fully set forth." For the use of the Steinway Tunnel Line certain payments are to be made which are not in dispute. The contract is between the city through the Public Service Commission, the plaintiff, and the New York Municipal Railway Corporation (The Brooklyn Company). The pertinent part is here quoted:

" Article Eighth: The Railway Corporation, after the commencement of joint operation and during the continuance of this agreement, shall pay to the Interborough

Company at quarter-yearly intervals for the quarter years ending March 31, June 30, September 30 and December 31 as rental an amount (for interest and amortization) equal to one-quarter of six per centum ($\frac{1}{4}$ of 6%) on one-half the cost of the line equipment (as defined in paragraph (c) of Article Sixth) of Subdivisions III, IV and V of the Steinway Tunnel Line. The cost of such line equipment shall be determined in the manner provided in the Interborough Contract for determining the cost of Equipment.

" Article Ninth: The Railway Corporation, after the commencement of joint operation and during the continuance of this agreement, shall also pay to the Interborough Company at quarter-yearly intervals for the quarter years ending March 31, June 30, September 30 and December 31 as rental an amount (for interest and amortization) equal to one-quarter of six per centum ($\frac{1}{4}$ of 6%) on one-quarter of the cost of construction of Subdivisions III, IV and V of the Steinway Tunnel Line. Such cost of construction shall be determined in the manner provided in the Interborough Contract.

" The Railway Corporation shall also pay to the Interborough Company at such quarter-yearly intervals, after the commencement of joint operation and during the continuance of this agreement, for such quarter years as additional rental, an amount (for interest and amortization) equal to one-quarter of six per centum ($\frac{1}{4}$ of 6%) on one-quarter of such cost of construction, provided, however, that such additional rental shall only be immediately payable for such quarter years as the revenue of the Railway Corporation as defined in Article XLIX of the Railway Contract shall exceed the amount of the deductions specified in Paragraphs 1 to 8 inclusive of said Article XLIX, and then only up to the amount of such excess; but any deficits in the payment of such additional rental under this paragraph shall be cumulative and shall bear simple interest and shall be paid to the Interborough

Company before any payment is made to the City under Paragraph 9 of said Article XLIX of the Railway contract."

Article 8 refers to cost of line equipment; article 9 to cost of construction, the first paragraph relating to the one-half of the one-half amount of the cost of construction expended by the Interborough. The second paragraph — the provisional payments — relates no doubt to the other half of the cost of construction contributed by the city. Anyhow this is only paid in any event out of surplus — What surplus? — " as the revenue of the Railway Corporation as defined in Article XLIX of the Railway Contract shall exceed the amount of the deductions specified in Paragraphs 1 to 8 inclusive of said Article XLIX."

We have given the eight deductions above. Until there is such a surplus no money is due under this last paragraph of article 9 of the Supplementary Agreement — the conditional payment. When will there be a surplus after such deductions as specified in article XLIX? Only after all deficits are made up as stated in article LI.

The appellant says that when the revenue in any quarter year exceeds the deductions the additional rental is due, irrespective of deficits in past quarter years. We would expect this contract to be more specific if such a change were to be made in the meaning and application of " quarter years " and " deficits," especially as the main contracts using these terms were made a part of or referred to in this Supplementary Agreement. We consider the words " for such quarter years as the revenue of the Railway Corporation as defined in Article XLIX of the Railway Contract shall exceed the amount of the deductions specified in Paragraphs 1 to 8 inclusive of said Article XLIX " to have the same effect as the contract containing said article, *i. e.*, there is no excess until past deficits are made up, for so says that contract in article LI.

The judgment should be affirmed, with costs.

FINCH, J. (dissenting). The action is brought to recover certain rentals claimed to be due under a written contract whereby the plaintiff, hereinafter referred to as the Interborough, leased certain trackage rights over its Steinway Tunnel Line to the New York Municipal Railway Corporation, the predecessor of the defendant, both defendant and its predecessor being hereinafter referred to as the Brooklyn Company. As to the facts no controversy exists. The Brooklyn Company contends that under its interpretation of a provision of the contract, hereinafter called the Supplementary Agreement, the rental in dispute has not become due and payable.

Prior to 1913, the Interborough operated the only municipally owned subway in the city of New York, pursuant to Contracts Nos. 1 and 2. In 1913 the city of New York, acting through the Public Service Commission for the First District, entered into three contracts for the construction, maintenance and operation of rapid transit lines in New York city. One contract was with the Interborough and is known as Contract No. 3; another was with the Brookyn Company and is known as Contract No. 4; the third contract was made by the city with the Interborough and the Brooklyn Company, and is known as the Supplementary Contract.

Contract No. 3 and Contract No. 4 are similar. Each provides for the construction of certain railroads, to be owned by the city and operated by the railroad company under a long term lease in conjunction with certain existing railroads which they respectively own. The railroad companies are required to furnish equipment and contribute towards the cost of construction of the new railroads to be built. The plan of both contracts was that, out of the revenues derived from each railroad system, the railroads should retain certain rentals, taxes, costs of operation and maintenance, an amount for depreciation, an amount each year equal to the average annual income from the operation of the already existing railroad (which

amount was fixed), and an amount equal to six per centum per annum on all moneys contributed by the railroad towards the construction and equipment of the new city-owned railroad. These preferential payments were to be cumulative and deficits therein were to be paid before the city should receive any return on the money it had invested. The investment of Interborough under Contract No. 3 was to be not less than $80,000,000. The investment of the Brooklyn Company under Contract No. 4 was to be not more than $13,500,000.

In Contract No. 3 the city reserved the right, and in Contract No. 4 the city agreed to provide the Brooklyn Company with trackage rights over the Steinway Tunnel Line for at least half the capacity thereof, if required by the Brooklyn Company.

This Steinway Tunnel Line was to be built, one-half by the Interborough and one-half by the city, and to be equipped by the Interborough. The Brooklyn Company had no investment in this line. Contracts Nos. 3 and 4 provided that " the precise terms and conditions for such trackage rights " should be embodied in a written agreement. It is admitted that the " precise terms and conditions thereof were embodied in a written agreement known as the Supplementary Agreement." This Supplementary Agreement consists of fifteen articles. The 8th and 9th articles prescribe the rental to be paid by the Brooklyn Company to the Interborough. In substance, these two articles, 8th and 9th, together provide that after the commencement of joint operation and during the continuation of this agreement, the Brooklyn Company shall pay to the Interborough, in quarterly payments, a rental amounting annually to six per cent on one-half of the costs of line equipment and on one-half the cost of construction of the Steinway Tunnel Line. The portion of the rental computed upon the basis of six per cent on one-half of the cost of line equipment is made payable unconditionally. The portion of the rental computed

upon the basis of six per cent on one-half the cost of construction is divided into two equal parts, one-half of which (amounting to one-quarter of the whole) is made payable unconditionally at quarterly intervals, and the remaining half, called " additional rental" is made payable at the same quarterly intervals, but the obligation to pay this " additional rental " is qualified by a proviso. The decision of this appeal depends upon the interpretation of that proviso.

The second paragraph of article Ninth, dealing therewith, reads as follows: " The Railway Corporation shall also pay to the Interborough Company at such quarter-yearly intervals, after the commencement of joint operation and during the continuance of this agreement, for such quarter years as additional rental, an amount (for interest and amortization) equal to one-quarter of six per centum ($\frac{1}{4}$ of 6%) on one-quarter of such cost of construction, provided, however, that such additional rental shall only be immediately payable for such quarter years as the revenue of the Railway Corporation as defined in Article XLIX of the Railway Contract shall exceed the amount of the deductions specified in paragraphs 1 to 8 inclusive of said Article XLIX, and then only up to the amount of such excess; but any deficits in the payment of such additional rental under this paragraph shall be cumulative and shall bear simple interest and shall be paid to the Interborough Company before any payment is made to the City under Paragraph 9 of said Article XLIX of the Railway Contract."

In 1923 the Brooklyn Company commenced joint operation of the Steinway Tunnel. From 1923 to 1929, the time when this action was commenced, in all except five quarters the quarterly revenues were in excess of the quarterly deductions specified in article XLIX of Contract No. 4. In all except those five quarters the excess revenues have been in excess of from five to forty times the amount of the " additional rental," and these deficits

were made up in the immediately succeeding quarters. For the entire period, current revenues have exceeded current deductions by an amount estimated at between three and four million dollars.

Between 1913 and 1923, however, the revenue of the Brooklyn Company had been inadequate to meet the deductions, and there had accumulated a deficit of more than $14,000,000. The Brooklyn Company contends that this entire deficit must be met before there may be any payments of the so-called "additional rental" under article 9 of the Suppementary Agreement. Thus the Brooklyn Company seeks to construe the Supplementary Agreement to cover this large deficit arising before the joint operation of the Steinway Tunnel. The Interborough on the other hand, contends that this "additional rental" is immediately payable in so far as there is sufficient current excess revenue out of which to make the payment.

All courts which have had before them for consideration these subway contracts are unanimous in agreeing that they must be read in the same manner as that in which they were drawn, namely, phrase by phrase and word by word. This does not permit of alteration or modification by implication.

As the Supreme Court of the United States said in *New York Rapid Transit Corp.* v. *City of New York* (303 U. S. 573, 592, affg. 275 N. Y. 258): "There is no reason to limit the ordinary meaning of words used in a contract by men prepared to invest under its terms. ' * * * a business proposition involving the outlay of very large sums cannot be and is not taken by the parties concerned according to offhand impressions; it is scrutinized phrase by phrase and word by word.' " And as this court said in *City of New York* v. *Interborough R. T. Co.* (257 N. Y. 20, 35) (which, though referring to Contract No. 3, has equal reference to the Supplementary Agreement): "The terms of the new contract were drafted in

such form as deliberately to exclude any possibility of modification by implication."

In *Gilchrist* v. *Interborough R. T. Co.* (279 U. S. 159) reference was made to the " great detail " with which one of the contracts was drawn, and the " carefully specified conditions " of the elevated contracts.

From this approach we consider the language used in the second paragraph of article Ninth.

In the first place, it is to be noted that as to each of these rental provisions we must place ourselves at the commencement of the period specifically referred to, namely, " after the commencement of joint operation." When the period is to commence is emphasized because it appears once in the 8th article, is repeated at the beginning of each paragraph of the 9th article, and in substance again in the 10th article which provides for the rental to be paid in case joint operation should begin before completion of the line. Starting then and reading this second paragraph of article Ninth, to ascertain when additional rental is payable without regard to a deficit, the paragraph would seem to state as clearly as the English language can indicate the intention of the parties, that the Brooklyn Company shall pay immediately to the Interborough, at quarter-yearly intervals after the commencement of joint operation, this fixed rental, if permitted by reason of an excess of revenue over definite deductions. The revenue is specifically defined, and the deductions are specifically defined. A more detailed analysis confirms the reading as a whole. Starting at a period after the commencement of joint operation, the Brooklyn Company is directed to pay to the Interborough this additional rental at such quarter-yearly intervals for such quarter years. This phrase, " for such quarter years," occurring twice in this second paragraph, refers plainly to the same quarter years which are mentioned in the first paragraph of article Ninth, namely, the quarter years ending March 31st, June 30th, September 30th

and December 31st, after the commencement of joint operation and during the continuation of this agreement. Moreover, this phrase " for such quarter years " thus repeated in the proviso, qualifies with certainty, and as specifically as concise language can, both the words " revenue " and " deductions " as used in the proviso. In other words, this proviso in certain terms prescribes a formula, namely, that the quarterly installments of the " additional rental " theretofore provided for, were to be " immediately payable " out of excess " revenue " over specified " deductions " for such " quarter years." Furthermore, the " deductions " specified in paragraphs 1 to 8, inclusive, of said article XLIX of the Brooklyn Contract No. 4 are quarter-yearly deductions, and only quarter-yearly deductions. This article XLIX defines the revenue and provides for quarterly deductions at the end of each quarter. The deductions are current deductions. No deductions other than quarterly current deductions are mentioned in article XLIX for the same quarter years as are mentioned in article Ninth of the Supplementary Agreement. Article XLIX, therefore, was utilized to determine from quarter to quarter, as additional rental became due under the Supplementary Agreement, what was the operating revenue of the Brooklyn Company for the corresponding quarter, and its excess over quarterly deductions. Article Ninth referred to article XLIX for the purpose of determining revenue and deductions, as used in article Ninth, for " such quarter years " mentioned in article Ninth.

Following the clause of the proviso which we have been considering, we come to the clause which relates exclusively to deficits in additional rental and which provides that these deficits in the immediate payment thereof shall be cumulative and each bear simple interest, and be paid to the Interborough before any payment is made to the city under the ninth paragraph of article XLIX. When these deficits are payable would seem to

present the only arguable question in the case. As already noted, during the period involved in this action, the revenues of the Brooklyn Company, in excess of deductions under paragraphs 1 to 8 of article XLIX, were sufficient to pay the additional rental in all quarters except five. The major part of the additional rental is, therefore, unaffected by the above-mentioned clause. No quarterly deficits accrued after the last quarter of 1924, and excess earnings over current deductions in the succeeding quarter, namely, the first quarter of 1925, were more than sufficient to pay not only current additional rental, but the deficits for the two preceding quarters then outstanding. Since this additional rental was "immediately payable" out of these earnings, and since, by reason of the provision for interest (showing that they are a past due obligation of the Brooklyn Company), they should be paid out of the first succeeding quarter when excess was sufficient not only to pay the current additional rental but also to permit the same to be applied upon the payment of the deficits for the preceding quarters. This conclusion is strengthened by the fact that if such construction is not adopted, interest accumulating on these unpaid deficits would delay a return to the city upon its investment in railroads constructed under Contract No. 4.

The Brooklyn Company urges that article Ninth of the Supplementary Agreement is not clear, and that the intention of the parties must be ascertained from what it calls the entire instrument, consisting not only of the Supplementary Agreement, but all of the Contracts Nos. 3 and 4. It points to the fact that the Supplementary Agreement contains a recital referring to Contracts 3 and 4 as if set forth at length therein. As against this, however, it is to be noted that the final recital before the beginning of the agreement in the Supplementary Agreement provides that "the Commission, the Interborough Company and the Railway Corporation have agreed upon

such terms and conditions as are hereinafter embodied in this agreement." The chief reliance of the Brooklyn Company, however, is upon its contention that the additional rental was only payable for such quarters as the revenue, as defined in article XLIX, should exceed the deductions specified in paragraphs 1 to 8 of article XLIX as modified by article LI. Article LI provides that " if in any quarter year the revenue shall be insufficient to meet the various obligations and deductions referred to in Article XLIX the deficits shall be cumulative and payments of such deficits shall be thereafter made in full before deducting the amounts " specified in the next succeeding paragraph.

The Brooklyn Company maintains that article LI is applicable, since it applies to article XLIX, and article XLIX is referred to in article Ninth of the Supplementary Agreement. From this the respondent urges that it need not pay any additional rental under article Ninth until all its cumulative deficits incurred prior to the commencement of joint operations shall have been met. It, therefore, becomes necessary for the Brooklyn Company to urge, in order to be successful, that the constructions which it contends for should be as if there had been written in, at the end of each of the numbered paragraphs, 1 to 8, of article XLIX, the following: " If in any quarter the revenue shall be insufficient to meet this deduction, the deficits shall be cumulative and payment of such deficits shall thereafter be made in full before deducting the amount specified in the next succeeding paragraph." In the same way the Brooklyn Company urges that if its construction is adopted, the effect of the second paragraph of article Ninth of the Supplementary Agreement must be considered as if a new paragraph, " which we may designate as paragraph 8-a, were inserted between paragraph 8 and paragraph 9 of article XLIX of Contract No. 4, such new paragraph providing for the payment of the additional rental, including deficits therein, with

interest, as a deduction to be made from revenue after those specified in paragraph 8 and before those specified in paragraph 9." None of the revenue would be applicable to the payment of this additional rental under the new paragraph 8-a, until all deductions under paragraphs 1–8 had been made in full, and none of the revenue could be used to make any payment to the city under paragraph Ninth until the additional rental provided for in said paragraph 8-a had been paid in full, including deficits and interest thereon.

It is a complete answer to this contention of respondent that article Ninth of the Supplementary Agreement does not provide the right to set off cumulative deficits. Moreover, it only incorporates by reference paragraphs 1–8 of article XLIX of Contract No. 4. It does not, however, either incorporate or refer to any more of article XLIX of Contract No. 4. We, therefore, have an agreement which provides for additional rentals whenever the quarterly revenue exceeds certain specified deductions, and neither the agreement nor the specified deductions makes any mention of cumulative deficits or deficits accumulated before any rent was due. Article Ninth, as already noted, provides for immediate payment out of current revenues to the extent that such current revenues exceed current deductions. And the only reference in article Ninth to article XLIX is for the purpose of indicating the revenue and specific deductions which are to be made. If the argument of the Brooklyn Company, that deficits, accumulated before the commencement of joint operation, are to be deducted, then it would be equally logical to deduct deficits arising on other parts of the line, concerning which it is provided that if the revenue is insufficient to pay the charges, the company shall be entitled to deduct the amount of such deficit from the revenue of the Brooklyn Company prior to making payments to the city. This furnishes an additional reason for excluding any deficit arising from the operations of the

Brooklyn Company at any time prior to the beginning of joint operations over the Steinway Tunnel Line.

Any other construction than that contended for by the Interborough would disregard the precision with which the parties drafted this Supplementary Agreement.

It follows that the judgment appealed from should be reversed, and judgment ordered in favor of the plaintiff for the several amounts of unpaid rental accruing during the period beginning April 8, 1923, and ending April 30, 1929, totaling $603,202.08, as set forth in the complaint, together with interest upon the said separate amounts from their respective due dates, with the costs of this action.

LEHMAN, O'BRIEN and HUBBS, JJ., concur with CRANE, Ch. J.; FINCH, J., dissents in opinion in which LOUGHRAN and RIPPEY, JJ., concur.

Judgment affirmed.